IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 6, 2009

## STATE OF TENNESSEE v. TRAVIS LESTER

Direct Appeal from the Criminal Court for Shelby County
No. 06-08526     James C. Beasley, Jr., Judge

No. W2008-00701-CCA-R3-CD  - Filed February 23, 2009

The defendant, Travis Lester, was convicted of reckless homicide, a Class D felony, and sentenced as a Range II, multiple offender to seven years in the Department of Correction.  On appeal, he argues that the evidence was insufficient to support his conviction.  Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which J.C. MCLIN and CAMILLE R. MCMULLEN, JJ., joined.

Juni S. Ganguli, Memphis, Tennessee, for the appellant, Travis Lester.

Robert E. Cooper, Jr., Attorney General and Reporter; Melissa Roberge, Assistant Attorney General; William L. Gibbons, District Attorney General; and Theresa McCusker and Damon Griffin, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

On October 26, 2006, a Shelby County Grand Jury indicted the defendant for second degree murder as a result of the shooting death of Domique Hampton.  Following a jury trial in January 2008, the defendant was convicted of the lesser-included offense of reckless homicide.

### State's Proof

Alberta Butler, the victim's mother, testified that her son was eighteen years old at the time of his death on June 22, 2006, and that she last saw him around 11:00 a.m. that day.

Eighteen-year-old Lethesa Swanigan testified that she knew both the victim and the defendant from "around the neighborhood." She said that on June 22, 2006, she and some friends were at a convenience store on Grand Street when she saw a young man, whom she recognized from the neighborhood, throw something at a teenaged girl whom she knew only as "Booky." A group of people, including the victim, laughed at "Booky." Swanigan and her friends then left the store and walked down Marechalneil Street where she saw the defendant retrieve a gun from the porch of an abandoned house. Later that day, she was "[r]unning around and playing" with some friends and, as she hid from one of her friends behind some bushes on Marechalneil Street, saw the victim pull up to a stop sign in his car. The defendant, who was on a bicycle, approached the victim's car, pointed a gun at the driver's side, and then rode off on his bicycle. The victim's car turned onto Douglass Street, swerved, and hit a pole. Swanigan ran down the street toward the car and saw someone pull the victim from the driver's side.

On cross-examination, Swanigan acknowledged that she could not hear what was said between the victim and the defendant and that the only window that was "shot out" on the victim's car was the backseat window. She explained that the defendant stood at the back driver's side window and fired one shot.

Deaundre Poole testified that he and the victim were best friends and that they were riding around smoking marijuana on the morning of June 22, 2006, when the defendant stopped them and asked to join them, but they refused. Later that day at Poole's house, Poole and the victim were "chilling, getting drunk and high and . . . fell asleep on the porch" when "Booky" came by and threw a small rubber football at them. They chased "Booky" to a convenience store at Grand and Park Streets where they encountered the defendant who told them, "I'm going to have to do something to one of y'all, by messing with my little sister ["Booky"]." Poole and the defendant exchanged words, and, as Poole turned to leave, the defendant hit him with a closed fist on the right side of his face. A fight ensued between Poole and the defendant, after which the defendant told Poole and the victim that he was going to kill one of them. As Poole and the victim were walking away, Poole saw the defendant get into a car and as he got out of the car, the defendant raised his shirt, displaying a .380 weapon on his hip.

Poole said that he and the victim subsequently drove through a neighborhood looking for a gun but did not find one. As they were driving back to the Orange Mound area, they saw the defendant riding a bicycle on Carnes Avenue. Poole jumped out of the car and "punched" the defendant off his bicycle. The two then began "tussling . . . swinging and fighting and throwing blows" in the middle of the street while the victim remained in the car. Poole said that he kicked the defendant "real hard, like I was kicking a football" and acknowledged that he struck and kicked the defendant several times. One of Poole's friends, "Little D," came to assist him in his fight with the defendant. At one point, the defendant reached for the gun on his hip, but Poole grabbed it and put it in his pocket. "Little D" subsequently left with the victim, but Poole remained because he "still wanted to get a little revenge" on the defendant. Soon thereafter, another friend of Poole's drove up, and Poole jumped in the car and left. A short time later, "Little D" informed Poole that the victim had been shot. Poole said he later discovered that the defendant's gun would not fire because it did not have a firing pin. Poole denied that the victim had a weapon that day or that he ever gave the victim the inoperable gun. He said that the victim was not involved in the fight with the defendant.

Eddie Craft testified that he was currently incarcerated at the Shelby County Jail for his convictions for aggravated robbery and possession of cocaine. He said that he and the defendant had been friends for four or five years and that he and the victim had been friends as well. He said that, the day after the shooting, the defendant called him and said that "two men had jumped on him and he ran across them and he had shot . . . at the car and messed around and shot [the victim]." The defendant told Craft that the shooting was accidental and that he had not intended to shoot the victim.

Officer Marlon Wright of the Memphis Police Department Crime Scene Investigation Unit testified that he responded to the scene at Marechalneil and Douglass Streets. He recovered a spent casing from the middle of the intersection and took photographs of the scene.

Officer Gerard Tuznik of the Memphis Police Department testified that on November 17, 2006, he responded to a domestic disturbance call at a residence on Randall Street. A man named Primo Sanchez answered the door and was "highly upset" because his girlfriend had allowed items to be brought into the house that he felt put his newborn child at risk. Sanchez then handed Officer Tuznik a magazine clip containing three rounds. During his investigation, Officer Tuznik learned that the gun that belonged to the clip was hidden behind a shed at a house on Vollintine. Officers subsequently recovered a black, nine-millimeter handgun from 1315 Vollintine.

Testifying through an interpreter, Primo Sanchez Duran said that on November 17, 2006, he lived on Randall Street with his girlfriend, who was the defendant's sister. Duran said he called the police that day because he found a pistol in a car in front of his house. He said he gave the magazine to the police but did not give them the pistol.

Special Agent Cervinia Braswell of the Tennessee Bureau of Investigation (TBI) testified that she was assigned to the firearms identification unit and that she conducted testing on the evidence she received in the case. The results of her testing showed that the bullet jacket taken from the left side of the victim's back was fired through the nine-millimeter pistol recovered from 1315 Vollintine.

Dr. Thomas Deering testified that he performed the autopsy of the victim's body and determined that the cause of death was a gunshot wound. He said that, in his opinion, the bullet struck an intermediate object before it struck the victim because there were three holes on the victim's body. He explained that the bullet jacket and core had separated and entered the left side of the victim's back, causing two side-by-side holes, and that the third hole was the exit wound which was located in the right upper chest. Dr. Deering said that he found traces of marijuana and components of cocaine in the victim's system.

On cross-examination, Dr. Deering said that the bullet core entrance wound was fifty-five inches above the victim's heel and that the exit wound was fifty-eight inches above the victim's heel. Dr. Deering agreed that the victim's gunshot wound was consistent with a shooter who had fallen and then fired the shot. However, on redirect examination, he said:

The direction that I describe in the measurements are made in what we call the anatomic position. . . . So when we measure them on the body that's what our measurements are. Bodies move, obviously, so when I have a wound track I describe it according to the anatomic position. And there may be any number of shooting positions that can arrive at that bullet path, depending on both the shooter and the deceased.

So if someone is turned this way, or if they're turning around, or if they're turning towards it, you may get a lot of change in the body's direction, but all I do is describe the path that it goes through as it actually goes through the body.

Retired Memphis Police Sergeant Thomas Helldorfer testified that in 2006 he was assigned to the homicide bureau and interviewed the defendant on July 4, 2006, after advising him of his rights. The defendant initially denied any knowledge of the victim's death, but, after being shown a photograph of the victim, the defendant admitted he had heard about it but denied that he was involved.

**Defense Proof**

Ashley Tuggle testified that she had known the defendant for over twenty years and that on June 22, 2006, she, her son, and her mother were at her grandmother's house when the defendant came by on his bicycle. While they were outside talking, three African-American men got out of a car and "jumped" the defendant. Tuggle said she did not see any of the men's faces but noticed they were armed with guns. She acknowledged that she did not see what the men did to the defendant because she ran to get out of the way.

Deidra Tuggle, Ashley Tuggle's mother, testified that she was at her mother's house at 2495 Carnes on June 22, 2006, when the defendant rode up on his bicycle and started talking to her and her family. A short time later, a car pulled up, and three men armed with shiny pistols got out while the driver remained in the car. She said that the men knocked the defendant to the ground and started beating him. Believing that bullets were "fixin' to fly," Tuggle grabbed her grandson and ran next door. She said she last saw the defendant running down the street.

Lashonda Armstrong testified that her nickname was "Booky" and that the defendant was "like family" to her although she was not related to him. She said that on June 22, 2006, she was at a convenience store when Deaundre, whom she knew as "Dray," threw a football at her "[a] couple of times." She asked him to stop, but he continued throwing the football at her and laughing at her. She said the victim was with "Dray." Armstrong saw the defendant inside the store and told him what was happening. The defendant then came outside and asked "Dray" to stop. A short fist fight then broke out between "Dray" and the defendant, after which they all left. A short time later, Armstrong saw the defendant riding his bicycle on Marechalneil Street. She said that "Dray," the victim, and some other young men armed with handguns got out of a burgundy car and "jumped" the defendant. The men "pistol whipped" the defendant and then got back into the same car, with the victim driving, and left. Shortly thereafter, Armstrong saw the defendant and others standing in the middle of Marechalneil Street near Douglass Street. She saw the same burgundy car travel down

Marechalneil Street and speed up as it approached the defendant. She said that the car struck the defendant and that the defendant's gun discharged one time as he fell to the ground. The car then "started going out of control" and traveled down Douglass Street.

The defendant elected not to testify.

## ANALYSIS

The defendant argues that the evidence was insufficient to support his conviction for reckless homicide. He asserts that there was not "a single shred of evidence" in the testimony of the State's witnesses to link him to the crime and that the testimony of the only State eyewitness, Lethesa Swanigan, was contrary to the physical facts of the case and should be disregarded based upon Dr. Deering's testimony about the trajectory of the bullet that struck the victim. The State argues that Swanigan's testimony was not completely contrary to the physical evidence and that even if her testimony were disregarded, the remaining evidence was sufficient to find the defendant guilty of reckless homicide.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

"Reckless homicide" is defined as "a reckless killing of another." Tenn. Code Ann. § 39-13-215(a). "Reckless" is defined as:

"Reckless" refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Id. § 39-11-302(c).

Our supreme court explained, in State v. Hornsby, 858 S.W.2d 892 (Tenn. 1993), the "physical facts rule," upon which the defendant relies in this appeal:

The so-called "physical facts rule" is the accepted proposition that in cases where the testimony of a witness is entirely irreconcilable with the physical evidence, the testimony can be disregarded. That is, where the testimony of a witness "cannot possibly be true, is inherently unbelievable, or is opposed to natural laws," courts can declare the testimony incredible as a matter of law and decline to consider it. United States v. Narciso, 446 F. Supp. 252, 282 (E.D. Mich. 1977). As stated by the Court in Wood v. United States, 342 F.2d 708, 713 (8th Cir. 1965), "where undisputed physical facts are entirely inconsistent with and opposed to testimony . . . the physical facts must control. No jury can be allowed to return a verdict based upon oral testimony which is flatly opposed to physical facts, the existence of which is incontrovertibly established." Id. at 713-14. Courts have made it clear that in order for testimony to be considered incredible as a matter of law, it must be unbelievable on its face, i.e., testimony as to facts or events that the witness physically could not have possibly observed or events that could not have occurred under the laws of nature. Thus, for example, if a witness was to testify that he saw the sun set in the east, the court would be free to declare such testimony incredible as a matter of law and disregard it.

Id. at 894 (additional citations omitted).

Additionally, the court explained that "the rule may not be invoked 'where its application depends upon assumptions or calculations based upon estimates as to speed, distance, time, and other such uncertain matters in the movement of [objects].'" Id. at 895 (quoting Waller v. Morgan, 133 S.W.2d 614, 616 (Tenn. Ct. App. 1939)).

Recently, in State v. Allen, 259 S.W.3d 671, 680 (Tenn. 2008), our supreme court considered the defendant's argument that the

"immutable physical law of gravity" renders impossible the eyewitness testimony that he fired the fatal shot while sitting in a car at street level because the victim was uphill from him. Defendant Lumpkin relies on Leland Tatum's testimony that Emma Tatum was "standing up" when she was shot and Dr. Smith's acknowledgement [sic] that there was "no way" a bullet fired from the street could travel through her body on the path it took if she were standing upright at the time the bullet struck her.

However, the court explained that the differing interpretations which the jury could give the testimony mean that the physical facts rules could not be applied:

> In this case, the proof about the victim's physical position at the moment she was shot is limited to Leland and Bishop's testimony. Given the circumstances surrounding the gunshots, the jury was entitled to interpret this testimony in several different ways, including a way which reconciles the victim's position at the time she was shot with Defendant Lumpkin's position at the time he was firing the gun. The physical facts rule therefore does not entitle this Court to disregard Leland and Bishop's eyewitness identification of Defendant Lumpkin as the shooter in assessing the sufficiency of the evidence.

Id. at 681.

In asserting that the physical facts rule should be applied in this case, the defendant argues that "it would be impossible for [the defendant] to . . . ride up and shoot [the victim] from a standing position and have the bullet travel in a[n] upward trajectory through his chest cavity. In fact, Dr. Deering stated in his testimony that his findings would be consistent with a shooter who had fallen and then shot upwards."

We will review the evidence against the defendant. Lethesa Swanigan testified that she saw the victim's car, as it was stopped at a stop sign, and saw the defendant point a gun at the driver's side and then ride off on his bicycle. She saw the defendant fire one shot through the passenger's window on the driver's side. Eddie Craft testified that, the day after the shooting, the defendant told him that two men had "jumped" him, and he later shot at their car and shot the victim. Primo Sanchez Duran, who lived with the defendant's sister, said that, about five months after the shooting, he found in a car in front of his house a pistol and called the police and gave the magazine from the pistol to an officer. Officer Gerard Tuznik of the Memphis Police Department testified that he responded to a disturbance call at the residence of Duran, who gave him a magazine clip containing three live rounds. Officers subsequently located the pistol which belonged to the clip, and TBI Special Agent Cervinia Braswell testified that the slug recovered from the victim's back had been fired through the recovered pistol. Dr. Thomas Deering testified that he performed the autopsy on the victim. He said that, before striking the victim, the bullet had struck an intermediate object and separated so that there were two side-by-side holes in the left side of the victim's back. He said that, in describing the victim's wounds, he was telling of the anatomical position, but that "there may be any number of shooting positions that can arrive at that bullet path, depending on both the shooter

-7-

and the deceased." Additionally, he said that "if someone is turned this way, or if they're turning around, or if they're turning towards it, you may get a lot of change in the body's direction."

Thus, the defendant's "physical facts" argument assumes that the victim was sitting upright in the seat as he was shot. However, there is no basis for such an assumption. Accordingly, we apply the holding of <u>Allen</u> and conclude that the jury reconciled, in favor of the State, the testimony of the eyewitnesses and that of Dr. Deering. We conclude that a reasonable jury could make such determinations and, thus, that the proof is sufficient to sustain the conviction.

## **CONCLUSION**

Based upon the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____

ALAN E. GLENN, JUDGE